**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**CHARLESTON DIVISION**

AIR EVAC EMS, INC.,

               Plaintiff,

v.                                   CIVIL ACTION NO.  2:16-cv-05224

TED CHEATHAM, et al.,

               Defendants.


**MEMORANDUM OPINION AND ORDER**


Pending before the Court is Defendants' Motion to Dismiss the Amended Complaint. (ECF No. 36.)   For the reasons discussed below, the motion is **DENIED**.

*I.     BACKGROUND*

Plaintiff Air Evac EMS, Inc. is a federally regulated air carrier providing air ambulance services in the State of West Virginia.   Its air ambulances depart from a number of air bases throughout the State when requested by third-party medical professionals or first responders. Because air ambulance services are often provided in emergencies, Air Evac must accept patients without regard to insurance coverage or ability to pay.   This includes patients covered by the Public Employees Insurance Agency ("PEIA") insurance and West Virginia workers' compensation insurance.   This lawsuit concerns Air Evac's ability to collect payment for services rendered to these patients.

On June 10, 2016, West Virginia House Bill 4315 went into effect.   *See* W. Va. Code § 5-16-8a.   Entitled "Air-ambulance fees," the statute contains two subsections.   The first applies to

all air ambulance providers that do not contract with PEIA, including Air Evac. *Id.* § 5-16-8a(a). It caps the amount Air Evac can recover from PEIA for transporting patients covered by PEIA insurance, limiting Air Evac's maximum reimbursement amount to the equivalent amount paid under the federal Medicare program. *Id.* Second, the statute eliminates Air Evac's ability to recover any payment from PEIA when it transports PEIA insurance plan participants who also participate in Air Evac's subscription program. *Id.* § 5-16-8a(b).

A description of the subscription program is in order. Under the terms of Air Evac's subscription program, a subscriber pays a fixed annual membership fee in exchange for the guarantee that if he or she requires air ambulance services during the year, and if Air Evac or its affiliates provide the requested transportation services, all air ambulance charges otherwise borne by the subscriber will be considered prepaid. (Am. Compl. ¶¶ 17–18.) Subscribers cannot call on Air Evac directly when services are needed, and there is no assurance of service. As in all cases, Air Evac has no way of knowing whether a patient is a participant in its subscription program prior to providing service. Thus, under the recently enacted statute, Air Evac must accept the membership fee as full payment when it provides emergency transportation services to a member covered by PEIA insurance. W. Va. Code § 5-16-8a(b). Air Evac cannot seek reimbursement of any kind from PEIA in this scenario. The annual membership fee under Air Evac's program is less than $100. (Am. Compl. ¶ 17.)

Aside from § 5-16-8a, the PEIA Finance Board has also capped the amount PEIA reimburses Air Evac for providing services to PEIA participants. *See* W. Va. R. tit. 151, Series 1, Attachment A. In the absence of the statute, the fee schedule would govern. (Am. Compl. ¶ 49.) Similarly, the Office of the Insurance Commissioner ("OIC") has limited the amount it will

reimburse for services rendered relating to injuries covered by West Virginia's workers' compensation scheme. The OIC is tasked with establishing and enforcing maximum reimbursement amounts to be paid to health care providers for service provided to workers' compensation claimants. (*Id.* ¶ 4.) Under the OIC's formula, Air Evac can recover only 135% of the reimbursement rate established by the federal Centers for Medicare and Medicaid Services. (*Id.* ¶ 58); W. Va. Code St. R. § 85-20-9. Air Evac has no contract with the workers' compensation program.

The PEIA and OIC fee schedules have prevented Air Evac from recouping its full fees. Air Evac alleges that in 2015, it provided air ambulance services to PEIA insurance plan participants as well as to patients whose injuries were covered by workers' compensation. Air Evac was paid a fraction of its billed charges for these transports. (Am. Compl. ¶¶ 53, 60.)

This litigation relates to another West Virginia statutory provision, West Virginia Code § 16-29D-4. The law prevents health care providers, including Air Evac, from recovering an unpaid balance from PEIA members—a practice known as "balance billing." (*Id.* ¶ 47.) The statute reads:

> (a) Except in instances involving the delivery of health care services immediately needed to resolve an imminent life-threatening medical or surgical emergency, the agreement by a health care provider to deliver services to a beneficiary of any department or division of the state which participates in a plan or plans developed under section three of this article shall be considered to also include an agreement by that health care provider:
>
> . . .
>
> (2) To accept as payment in full for the delivery of such services the amount specified in plan or plans or as determined by the plan or plans. In such instances, the health care provider shall bill the division or department, or such other person specified in the plan or plans, directly for the services. The health care provider shall not bill the beneficiary or any other person on behalf of the beneficiary and,

3

except for deductibles or other payments specified in the applicable plan or plans, the beneficiary shall not be personally liable for any of the charges, including any balance claimed by the provider to be owed as being the difference between that provider's charge or charges and the amount payable by the applicable department or divisions. . . .

W. Va. Code § 16-29D-4. Though the statute provides an exception for emergency medical services, Air Evac alleges that the State of West Virginia does not consider emergency transportation services to fall within the scope of that exception. Under the State's interpretation, Air Evac may not "balance bill" PEIA patients, whether it rendered services in an emergency or not. Section 16-29D-4, like § 5-16-8a and the laws applicable to reimbursement under the workers' compensation scheme, carries civil and criminal sanctions for violations of its terms. *See* W. Va. Code § 16-29D-8 (authorizing the Secretary of the DHHR to seek civil penalties from any provider who balances bills).

On June 9, 2016, the day before § 5-16-8a took effect, Air Evac filed suit against Ted Cheatham, the Director of the PEIA; Mary Jake Pickens, Joshua Sword, James W. Dailey II, Troy Giatras, Elaine A. Harris, William Ihlenfeld, Brian Donat, William Milam, and Michael Smith, members of the PEIA's Finance Board; and Michael D. Riley, West Virginia's Insurance Commissioner. Air Evac later amended the Complaint to add Karen L. Bowling, then the Secretary for the West Virginia Department of Health and Human Resources ("DHHR"), as a defendant. (Am. Compl. ¶ 5.)

The Amended Complaint contains six claims for relief. Counts One and Two seek a declaration that the two subsections of § 5-16-8a are each preempted by the Airline Deregulation Act of 1978 ("ADA") because they establish and limit the price of Air Evac's services. The claims request injunctive relief against Defendants Cheatham and Riley. The third claim alleges

that the regulation of Air Evac's subscription agreements violates the Contracts Clause of the United States Constitution and seeks declaratory and injunctive relief. The fourth and fifth claims for relief similarly seek a declaration that the PEIA and OIC fee schedules are preempted by the ADA. The claims seek injunctive relief against the PEIA Finance Board (Count Four), and Defendant Riley (Count Five). The sixth claim for relief is pled in the alternative. In the event the Court does *not* invalidate § 5-16-8 and the fee schedules, Air Evac asks the Court to invalidate the prohibition on balancing billing as preempted by the ADA.

Defendants moved to dismiss the original Complaint on August 12, 2016.[1] Air Evac filed an Amended Complaint on August 25, 2016, which Defendants answered with an Amended Motion to Dismiss on September 15, 2016. That motion has been fully briefed. On March 23, 2017, Air Evac filed a Notice of Supplemental Authority, to which Defendants responded on April 6, 2017.

## II.    LEGAL STANDARDS

The Amended Motion to Dismiss implicates different standards of review. A motion to dismiss based on lack of subject matter jurisdiction falls under Federal Rule of Civil Procedure 12(b)(1), while a motion to dismiss for failure to state a claim is governed by Federal Rule of Civil Procedure 12(b)(6).

### A.    Rule 12(b)(1)

It is axiomatic that a court must find it has jurisdiction before determining the validity of any claims brought before it. *Evans v. B.F. Perkins Co.*, 166 F.3d 642, 647 (4th Cir. 1999). A motion to dismiss an action under Rule 12(b)(1) raises the question of the federal court's subject

---

[1] In light of the filing of the Amended Complaint, the Court denied the original Motion to Dismiss as moot on October 17, 2016.

matter jurisdiction over the action. "Challenges to jurisdiction under Rule 12(b)(1) may be raised in two distinct ways: 'facial attacks' and 'factual attacks.'" *Adkins v. United States*, 923 F. Supp. 2d 853, 856 (S.D. W. Va. 2013) (citing *Thigpen v. United States*, 800 F.2d 393, 401 n. 15 (4th Cir. 1986)). A "facial attack" questions whether "the allegations of the complaint are facially []sufficient to sustain the court's jurisdiction." *Thigpen*, 800 F.2d at 401 n. 15. In such a case, the court must accept the allegations as true and proceed to consider the motion as it would a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). *Id.* Defendants' ripeness and sovereign immunity defenses are facial attacks to subject matter jurisdiction. "The burden of showing the existence of subject matter jurisdiction rests on the plaintiff." *Adkins*, 923 F. Supp. 2d at 857 (citation omitted).

B.      Rule 12(b)(6)

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of a civil complaint. *See Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999). "[I]t does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992) (citation omitted). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, 'to state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

III.      DISCUSSION

Defendants advance four main arguments in support of their Amended Motion to Dismiss. They contend, first, that Air Evac's claims are not ripe for disposition and second, that the Eleventh Amendment bars the suit. The bulk of their brief centers on the third argument, namely that the

ADA does not preempt the state statutes and regulations in question. Finally, Defendant assert that the Air Evac's Contracts Clause challenge fails to state a claim because the laws advance a significant and legitimate public purpose enforced by reasonable and necessary means.[2]

A.    *Ripeness*

The ripeness doctrine "prevent[s] the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements." *Abbott Labs. v. Gardner*, 387 U.S. 136, 148 (1967). Article III limits federal jurisdiction to live "cases and controversies," *Allen v. Wright*, 468 U.S. 737, 750 (1984), and the doctrine preserves this requirement by "preventing judicial consideration of issues until a controversy is presented in 'clean-cut and concrete form.'" *Miller v. Brown*, 462 F.3d 312, 318–19 (4th Cir. 2006) (quoting *Rescue Army v. Mun. Court of L.A.*, 331 U.S. 549, 584 (1947)). Thus, at its essence, ripeness is a question of timing. *Blanchette v. Connecticut Gen. Ins. Corps.*, 419 U.S. 102, 140 (1974). Here, the parties dispute whether Air Evac faces a genuine threat of sanctions under § 5-16-8a so as to create a matter ripe for pre-enforcement review.

To determine whether a case is ripe for pre-enforcement review, courts "balance the fitness of the issues for judicial decision with the hardship to the parties of withholding court consideration." *Miller*, 462 F.3d at 319 (4th Cir. 2006) (citation omitted); *see Nat'l Park Hosp. Ass'n v. Dep't of the Interior*, 538 U.S. 803, 808 (2003) (setting forth fitness and hardship as the two predominant factors in determining ripeness). With respect to fitness, a claim is unfit for adjudication where the possibility of injury is remote and the issues presented abstract. *Texas v.*

---

[2] As should be immediately apparent, Defendants' preemption and Contracts Clause arguments ask for judicial resolution of the ultimate legal questions at issue in this declaratory judgment action. The Court is unable to definitively resolve these questions on a motion meant merely to test the sufficiency of a plaintiff's pleading.

*United States*, 523 U.S. 296, 301 (1998) ("A claim is not ripe . . . if it rests upon 'contingent future events that may not occur as anticipated, or indeed may not occur at all.'" (quoting *Thomas v. Union Carbide Agric. Products Co.*, 473 U.S. 568, 580–81 (1985))); *Miller*, 462 F.3d at 319 (to be ripe, an action in controversy must not be "dependent on future uncertainties.").

A claim that presents purely legal issues is more likely to be found ripe. *Pacific Gas and Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 201 (1983) (questions of preemption are "predominantly legal" and thus more appropriate for pre-enforcement adjudication); *see also Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334, 2347 (2014) (finding the "fitness" factor "easily satisfied" where petitioners' preenforcement challenge presented a purely legal issue that would not be clarified by further factual development). Air Evac attacks § 5-16-8a on grounds that the statute is preempted by the ADA and violates the Contracts Clause. Both arguments are purely legal in nature, a point Defendants do not dispute. Nor can the Court find that the issues Air Evac presents are in any way dependent on future uncertainties. HB 4315 is now law in West Virginia; its mandates have present and immediate effect.

Defendants center their ripeness challenge on the hardship prong of the analysis. With regard to interference with the subscription agreements, Defendants argue that Air Evac may never be harmed by the statutory requirement to treat a PEIA member's subscription fee as payment in full. The possibility of injury is too remote, Defendants reason, because the statute would only apply if a PEIA member has a subscription contract with Air Evac and Air Evac provides air ambulance services on the member's behalf. Defendants gloss over this crucial fact: Air Evac does not know of a patient's insured status, nor of his or her membership in Air Evac's subscription program, prior to rendering service. In any event, Air Evac could not refuse service on this basis.

Subsection (b) of § 5-16-8 requires Air Evac to factor into its business plan now the possibility that it will recover no more than a nominal membership fee when transporting members insured through PEIA. Air Evac must make the same calculus to accommodate West Virginia law's prohibition of balancing billing. Air Evac has no advance warning and no means to assess the relevant financial risks before being called upon to provide service.

The Fourth Circuit has found a pre-enforcement challenge is ripe for adjudication under similar circumstances. *Retail Indus. Leaders Ass'n v. Fielder*, 475 F.3d 180 (4th Cir. 2007). In *Retail Industry*, the Fourth Circuit considered a legal challenge brought by retailer giant Wal-Mart to a Maryland healthcare spending law. The law required Wal-Mart to spend a specified percentage of profits on employee healthcare or else pay the difference to the State. In assessing ripeness, the Fourth Circuit noted that although Wal-Mart's injury remained somewhat speculative—a remote possibility existed that Wal-Mart's expenditures would exceed the minimum threshold—Wal-Mart as "very likely to incur liability to the State under the Act's minimum spending provision." *Id.* at 188. Indeed, even if Wal-Mart never suffered actual injury, the retailer's claims were ripe because "it must alter its internal accounting procedures and healthcare spending *now* to comply with the Act." *Id.*

As in *Retail Industries*, the application of § 5-16-8a to Air Evac is certain, as is Air Evac's inability to escape liability under the statute unless it complies with the altered billing requirements now. This is a present, concrete hardship that makes Air Evac's pre-enforcement challenge appropriate for judicial resolution. The Court rejects Defendants' ripeness challenge.

B.      *Eleventh Amendment*

Next, Defendants claim Eleventh Amendment immunity. At issue is whether the *Ex parte Young* exception to sovereign immunity applies in this case.

"Sovereign immunity is the privilege of the sovereign not to be sued without its consent." *Virginia Office for Prot. and Advocacy v. Stewart*, 563 U.S. 247, 253 (2011). Absent waiver or Congressional abrogation, the Eleventh Amendment protects a State from private suit in federal court. *See id.* *Ex parte Young* serves as a limitation on the sovereign-immunity principle. 209 U.S. 123 (1908). The case permits suits against state officers for prospective relief where there is an ongoing violation of federal law. *Id.* at 159–60. The Supreme Court summarized the impact of *Ex parte Young* on Eleventh Amendment immunity as follows:

> The Eleventh Amendment confirms the sovereign status of the States by shielding them from suits by individuals absent their consent. To ensure the enforcement of federal law, however, the Eleventh Amendment permits suits for prospective injunctive relief against state officials acting in violation of federal law. This standard allows courts to order prospective relief, as well as measures ancillary to appropriate prospective relief. Federal courts may not award retrospective relief, for instance, money damages or its equivalent, if the State invokes its immunity.

*Frew ex rel. Frew v. Hawkins*, 540 U.S. 431, 437 (2004) (internal citations omitted). The Supreme Court has repeatedly emphasized that *Ex parte Young* requires only a "straightforward inquiry into whether the complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." *Verizon Maryland, Inc. v. Public Service Commission of Maryland*, 535 U.S. 635, 645 (2002) (quoting *Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 296 (1997) (internal quotation marks omitted)).

Defendants submit three arguments against *Ex parte Young*'s application in this case. They submit, first, that Air Evac has not alleged an ongoing violation of federal law with regard to the application of § 5-16-8a because Defendants have not threatened an enforcement action

against Air Evac. Second, they claim that Air Evac's prayer for declaratory relief is not prospective in nature because it seeks a declaration as to the past enforcement of the PEIA and OIC fee schedules. Third, Defendant take the position that Air Evac's request for costs, fees, and expenses is barred by the Eleventh Amendment, particularly as the request relates to PEIA and the OIC's past application of their fee schedules.

With regard to the first of these arguments, the Court begins by noting, "where prospective relief is sought against individual state officers in a federal forum based on a federal right, the Eleventh Amendment, in most cases, is not a bar." *Coeur d'Alene Tribe of Idaho*, 521 U.S. at 276–77 (citation omitted). Air Evac's prayer for injunctive relief against state officials—seeking to constrain them from enforcing state laws and regulation in contravention of federal law—appears to satisfy the "straightforward inquiry" endorsed by the Supreme Court. *Verizon*, 535 U.S. at 645. Even so, Defendants contend that Air Evac cannot avail itself of the *Ex parte Young* exception because without alleging a threat of enforcement, Air Evac cannot show an "ongoing violation of federal law." (Defs.' Reply at 6.)

Defendants take too narrow a view of enforcement. "The requirement that the violation of federal law be ongoing is satisfied when a state officer's enforcement of an allegedly unconstitutional state law is threatened, even if the threat is not yet imminent." *Waste Mgmt. Holdings, Inc. v. Gilmore*, 252 F.3d 316, 330 (4th Cir. 2001) (citing *Summit Med. Assocs., P.C. v. Pryor*, 180 F.3d 1326, 1338–41 (11th Cir. 1999)). In *Waste Management*, the Fourth Circuit considered a lawsuit brought by Virginia landfill operators and transporters of municipal solid waste challenging the implementation of certain Virginia statutes. Collectively, the statutes capped the amount of municipal solid waste accepted by Virginia landfills and restricted the use

of barges and trucks to transport the waste within that State. The restriction on waste transportation required the responsible utility board to implement regulations governing the transport of municipal solid waste in accordance with the statute. The plaintiffs brought suit following the enactment of the statutes in issue, challenging their validity under the dormant Commerce, Contract, and Equal Protection Clauses of the United States Constitution. *Id.* at 324. The State defendants raised an Eleventh Amendment challenge to the plaintiffs' action. Though there had been no threatened or actual proceeding to enforce the state laws against the plaintiffs, the Fourth Circuit focused on the relief sought in the plaintiff's pleading. The plaintiffs sought injunctive relief against state officials, at least some of whom bore direct enforcement responsibility for the challenged statutes. This was sufficient for the Fourth Circuit to find, "The case before us is precisely the type of case to which the *Ex parte Young* doctrine applies." *Id.* at 330.

As the Eleventh Circuit reasoned in *Summit*, a case cited favorably by the Fourth Circuit in *Waste Management*, the ongoing violation "requirement does not mean that the enforcement of the allegedly unconstitutional state statute actually must be in progress against the particular plaintiffs initiating suit." 180 F.3d at 1338. The requirement merely serves to distinguish "between cases where the relief sought is prospective in nature . . . and cases where relief is retrospective." *Id.* Nor can Defendants successfully argue that the threat of enforcement is not "imminent" because Air Evac has so far remained in compliance with the law. "The *Ex parte Young* doctrine does not demand that a plaintiff first risk the sanctions of imminent prosecution or enforcement in order to test the validity of a state law." *Id.*; *see Waste Mgmt. Holdings*, 252 F.3d at 330 (holding that a pre-enforcement challenge to Virginia law restricting the transportation of

municipal solid waste was "precisely the type of case to which the *Ex parte Young* doctrine applies," even without evidence that the State had threatened to enforce the laws by actual proceeding).

Rather, enforcement can be shown through a state-law scheme that imposes a "compulsion or constraint" in contravention of federal law. *Air Evac EMS, Inc. v. Texas*, 851 F.3d 507, 519 (5th Cir. 2017). In *Air Evac EMS v. Texas*, the Fifth Circuit considered two "critical features" of the Texas workers' compensation framework similar to those at issue here: "a maximum-reimbursement system" and "a prohibition on 'balance-billing.'" *Id.* As it does in this case, Air Evac challenged the Texas law as preempted by the ADA or, in the alternative, sought declaratory and injunctive relief against the balance-billing prohibition. The Texas district court dismissed the case on Eleventh Amendment grounds, reasoning that Air Evac's claims failed under *Ex parte Young* because the air ambulance provider made no showing that "an enforcement proceeding concerning the balance-billing prohibition is imminent, threatened, or even intended." *Air Evac EMS, Inc. v. Texas*, 2016 WL 4259552, at *8 (W.D. Tex. Aug. 11, 2016). The district court did not consider whether the maximum-reimbursement provision constituted "enforcement" because the Texas law contained an atypical feature whereby Air Evac did not directly submit its bill for services to the Texas Workers' Compensation Commission. Instead, "Air Evac and other health care service providers submit their billed charges to the workers' compensation insurers, who then reimburse the providers in accord with the maximum allowable reimbursement set by the Commission." *Id.* at *8. The district court reasoned that the reimbursement limitations could not be "enforced" against Air Evac because "Air Evac is not the actor constrained by them." *Id.*

It was on this basis that the Fifth Circuit reversed. The appellate court held that direct enforcement, such as where an attorney general threatens prosecution, is not required to satisfy *Ex parte Young*. *Air Evac EMS*, 851 F.3d at 519. It was sufficient that the State constrained Air Evac's ability to collect more than the established reimbursement rate under the Texas workers' compensation scheme, even if indirectly. The Fifth Circuit also took note of a feature of that scheme which allowed Texas healthcare providers to dispute the rate of payment within the Texas Division of Workers' Compensation. "Between their rate-setting authority and role in arbitrating fee disputes through the administrative process," the Fifth Circuit held, "state defendants effectively ensure the maximum-reimbursement scheme is enforced from start to finish." *Id.* It was irrelevant that Air Evac occupied a different place within that scheme. The Fifth Circuit observed that "state defendants obviously *constrain* Air Evac's ability to collect more than the maximum-reimbursement rate under the [workers' compensation] system." *Id.* (emphasis in original).

Air Evac's recent Notice of Supplemental Authority is based on the favorable ruling it won in the Fifth Circuit case. Defendants respond that the Texas scheme is too dissimilar to West Virginia's to justify the adoption of the Fifth Circuit's holding. In the Court's view, however, the dissimilarities make the *Ex parte Young* exception more applicable, not less. Defendants point out that unlike in the Texas workers' compensation scheme, the fee schedules established by PEIA and the OIC do not constrain or limit the amount private health insurance providers may pay to compensate air ambulance carriers for transportation of their insured. Nor is PEIA or the OIC authorized to act as the arbiter of disputes relating to the rates that private health benefit and insurance providers pay to compensate air ambulances like Air Evac. These do indeed represent

14

factual differences between Texas workers' compensation laws and West Virginia's.   The Fifth

Circuit underscored these facts, along with the pervasive nature of Texas's scheme, to support its

conclusion that the State exercised coercive authority over Air Evac even though Air Evac was not

directly targeted by the scheme.   As the Court understands the West Virginia regulations, Air

Evac submits its request for compensation directly to PEIA or the OIC, as the case may be.   It is

directly constrained by the State's caps on compensation.   Though the Texas scheme may be more

pervasive, that factor is less important here because the laws Air Evac challenges here are directly

enforceable against it.

Defendants' attempt to distinguish the Fifth Circuit case by arguing that the OIC and PEIA

are not authorized to enforce their fees schedules through punitive measures is disingenuous at

best.   *See, e.g.*, W. Va. Code § 61-3-24g(1) (punishing as a felony the knowing and willful making

of charges in excess of those the OIC fee schedule allows); § 16-29D-8 (authorizing the Secretary

of the DHHR to penalize health care providers who balance-bill with civil and criminal sanctions).

In any event, *Ex parte Young* does not apply only to those state laws enforceable through punitive

sanctions.   *See Air Evac EMS*, 851 F.3d at 519 (threat of civil and criminal prosecution not

required for *Ex parte Young* to apply); *Waste Mgmt.*, 252 F.3d at 329–30 (finding plaintiffs

satisfied *Ex parte Young* without making mention of any penalty, criminal or civil, that could be

assessed for violation of the relevant waste management laws).   Defendants threaten to enforce

the maximum-reimbursement scheme by suing Air Evac.   (Defs' Mem. in Support Mot. to

Dismiss 17–18.)   Threat of litigation is another method of enforcement.   West Virginia has

constrained Air Evac's ability to recoup its full charges in a number of different ways, and Air

Evac's suit to enjoin State officials from enforcing these restrictions satisfies the requirements of *Ex parte Young*.

With that, the Court considers Defendants' concern about Air Evac seeking a declaration about past agency action. The Fourth Circuit rejected a similar argument in *South Carolina Wildlife Federation v. Limehouse*, 549 F.3d 324 (4th Cir. 2008). There, an environmental group brought suit against several South Carolina state agencies alleging violations of federal environmental laws in relation to the proposed construction of a bridge connector. Federal law required South Carolina to submit an environmental impact statement prior to beginning construction addressing the expected adverse environmental impact of the project. South Carolina submitted the statement as required and won the approval of federal authorities to initiate the construction of the bridge. The environmental group sued, seeking a declaration that the environmental impact statement and accompanying record of decision were improperly issued and requesting an injunction against future construction pending compliance with federal law. *Id.* at 238.

The Fourth Circuit held that case was a valid *Ex parte Young* action. *Id.* The court was not troubled by the fact that the environmental group sought a declaration concerning past conduct, that is, the approval of the environmental impact statement. After all, "[t]he declaratory relief SCWF seeks is simply the determination that past actions by the Defendants did not comply with [federal law]." *Id.* at 332. Such a declaration, if awarded, "adds no additional burden on the Defendants other than the injunctive relief, and therefore does not threaten the sovereignty of the state." *Id.* Such is the case here. Air Evac seeks a declaration that past conduct violated federal law and asks the Court to enjoin future violations. That relief would not impose any additional

obligations on the State and does not run afoul of the Eleventh Amendment. *See also Verizon*, 535 U.S. at 646 (action seeking an injunction and declaration of past conduct could be brought under *Ex parte Young* because the prayer for declaratory relief added nothing in terms of liability exposure to the State).

This brings the Court to the availability of attorneys' fees. The Eleventh Amendment does not preclude an award of attorneys' fees against a state official in his or her official capacity. *See Hutto v. Finney*, 437 U.S. 678, 699–700 (1978). While fee shifting is impermissible "[a]bsent explicit authorization of Congress," *In re Crescent City Estates,* LLC, 588 F.3d 822, 826 (4th Cir. 2009), a request for fees and costs is not an Eleventh Amendment issue. *Missouri v. Jenkins ex rel. Agyei*, 491 U.S. 274, 284 (1989) ("[T]he Eleventh Amendment has no application to an award of attorney's fees, ancillary to a grant of prospective relief, against a State."). In all respects, Defendants' motion to dismiss on Eleventh Amendment grounds is therefore **DENIED**.

### C.    *Preemption under the ADA*

The United States Constitution's Supremacy Clause makes federal law "the supreme law of the land . . . anything in the Constitution or laws of any State to the contrary notwithstanding." U.S. Const. art. VI, cl. 2. "As a result, federal statutes and regulations properly enacted and promulgated can nullify conflicting state or local actions." *Coll. Loan Corp. v. SLM Corp.*, 396 F.3d 588, 595 (4th Cir. 2005). Such state or local laws may be preempted under the Supremacy Clause in three ways—by express preemption, field preemption, or conflict preemption. *See Watkins v. Wells Fargo Home Mortg.*, 631 F.Supp.2d 776, 783 (S.D. W. Va. 2008) (citing *Anderson v. Sara Lee Corp.*, 508 F.3d 181, 191 (4th Cir. 2007) (internal citation omitted)). At issue in this case is express preemption, which occurs when "Congress expressly declares its intent

17

to preempt state law." *Pinney v. Nokia, Inc.*, 402 F.3d 430, 453 (4th Cir. 2005). Focusing on the plain wording of the statute is the best way to deduce Congress' preemptive intent. *Chamber of Commerce of United States v. Whiting*, 131 S. Ct. 1968, 1977 (2011) (quoting *CSX Trans., Inc. v. Easterwood*, 507 U.S. 658, 664 (1993)).

> The preemptive provision of the ADA reads:
>
> Except as provided in this subsection, a State, political subdivision of a State, or political authority of at least 2 States may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route, or service of an air carrier that may provide air transportation under this subpart.

49 U.S.C. § 41713(b). The ADA defines "States" as "a State, the District of Columbia, and a territory of possession of the United States." § 41713(a). Air Evac alleges that it is an "air carrier" covered by the ADA, (Am. Compl. § 19), a fact Defendants do not dispute.

Defendants raise a three-fold argument to support their contention that the ADA's preemption provision does not apply in this case. They begin by asserting that the State's regulation of health care benefits on behalf of PEIA and workers' compensation insured is a traditional state function not captured within the ADA's preemptive scope. Next, Defendants contend that West Virginia is acting as a "market participant" contracting for health care services, not a market regulator. They conclude with the argument that preemption under the ADA "is contrary to the powers reserved to the State by the [Tenth] Amendment of the United States Constitution." (Defs' Mem. at 21.) The Court considers each argument in the order presented, mindful that issues of fact preclude ultimate resolution of the "market participant" question now.

### i.    *Traditional State Function*

Defendants correctly note that the preemption inquiry begins "with the assumption that the historic police powers of the States are not to be superseded by [federal law] unless that was the

clear and manifest purpose of Congress." *Altria Group, Inc. v. Good*, 555 U.S. 70, 77 (2008) (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)). The assumption is even stronger when Congress legislates in a field of traditional state regulation. *Id.* (citing *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996)). Thus, the Supreme Court instructs "when the text of a pre-emption clause is susceptible of more than one plausible reading, courts ordinarily 'accept the reading that disfavors pre-emption.'" *Id.* (quoting *Bates v. Dow Agrosciences, LLC*, 544 U.S. 431, 449 (2005)). Yet when Congress has made plain its desire to preempt state law, it matters not whether it legislates in a field typically occupied by the States. *See Egelhoff v. Egelhoff ex rel. Breiner*, 532 U.S. 141, 151 (2001) ("There is indeed a presumption against pre-emption in areas of traditional state regulation . . . [b]ut that presumption can be overcome where, as here, Congress has made clear its desire for pre-emption." (citation omitted)). In such a case, the Supreme Court "ha[s] not hesitated" for find state laws falling within the scope of the federal law preempted." *Id.*

In the context of the ADA, Congress did just that. Reviewing the preemption provision, the Supreme Court has remarked that the statute "express[es] a broad pre-emptive purpose," *Morales*, 504 U.S. at 383, and thus "State enforcement actions having a connection with, or reference to, airline 'rates, routes, or services' are pre-empted." *Id.* at 384. The Supreme Court reaffirmed *Morales'* holding in *Rowe v. New Hampshire Motor Transport Association*, 552 U.S. 364 (2008). *Rowe* considered the question of preemption in the context of the Federal Aviation Administration Authorization Act ("FAAAA"). The state law at issue originated from Maine, which enacted a law forbidding licensed tobacco retailers from employing a "delivery service" unless the service followed particular delivery procedures.

The Supreme Court observed that the FAAAA contains a broad preemption provision "borrowed from the [ADA]." *Id.* at 368. The Maine law ran into conflict with the FAAAA by substituting governmental edict for "competitive market forces." *Id.* at 372 (citing *Morales*, 504 U.S. at 378). Maine argued, as Defendants do here, that the FAAAA did not preempt the State's efforts to legislate in the field of public health—an area that is, without question, typically reserved to the states. The Court rejected the argument, noting that the FAAAA's list of exceptions to preemption "says nothing about a public health exception." *Id.* at 997. The holding recognizes the principle that "[h]owever traditional the area, a state law may simultaneously interfere with an express federal policy," and so be preempted. *DiFiore v. Am. Airlines, Inc.*, 646 F.3d 81, 86 (1st Cir. 2011).

The ADA's preemption provision has been interpreted in like manner, with at least one federal district court recently holding that state regulations limiting the amount air ambulance providers can recover for their services are preempted by the ADA. *Valley Med Flight, Inc. v. Dwelle*, 171 F.Supp.3d 930, 942 (D. N.D. 2016) ("The clear intent of the legislation is to prevent air ambulance service providers, who are not participating providers, from imposing exorbitant fees on patients who wrongly assume their insurance will cover the charges and are not in a position to discover otherwise. This type of consumer protection law is precisely the type of law Congress sought to preempt when it enacted the ADA." (citation omitted)). The Court need not adopt this conclusion to resolve the pending motion to dismiss. A finding that Defendants do not escape the ADA's reach because the legislation was enacted with the aim of protecting public health suffices. On this basis, the Amended Motion to Dismiss is **DENIED**.

*ii.      Market Participant Doctrine*

Second, Defendants assert that the State of West Virginia enacted the laws at issue as a "market participant" contracting for health care services, not as a market regulator.   The gist of the argument is that the restrictions on reimbursement at issue here do not carry "the force and effect of law." (Def. Br. at 17.)   Rather, say Defendants, the restrictions arise from the State's own contract-based participation in the healthcare market—a sphere free from the preemptive power of the ADA.

The parties' debate center on *American Trucking Associations v. City of Los Angeles*, 133 S. Ct. 2096 (2013).   In *American Trucking*, the Supreme Court considered the preemptive effect of the FAAAA over certain contractual requirements imposed on trucking companies by the Port of Los Angeles ("the Port").   The Port contracted with trucking companies—federally licensed motor carriers—to move cargo into and out of the Port.   The contracts included two standard terms at issue in the case.   The contracts obligated the trucking companies to affix a placard on each truck with a phone number for reporting concerns and required the submission of a plan listing off-street parking locations for each truck. The trucking companies challenged these contractual terms as preempted by the FAAAA.

As previously noted, the preemption provision of the FAAAA is identical to the ADA's. The former statute preempts a state "law, regulation, or other provision having the force and effect of law related to a price, route, or service of any motor carrier . . . with respect to the transportation of property." 49 U.S.C. § 14501(c)(1).   In *American Trucking*, the parties agreed that the regulation at issue met the "related to" prong of the preemption statute.   133 S. Ct. at 2102. ("All parties agree that the Port's placard and parking requirements relate to a motor carrier's price,

route, or service with respect to transporting property." ).  Similarly, Defendants in this case concede that the laws at issue here—the statutory caps and fee schedules limiting Air Evac's reimbursement; the prohibitions on balance-billing; and the alteration of Air Evac's membership contracts—are "related to a price . . . of an air carrier."  49 U.S.C. § 41713(b)(1).  The question here, as in *American Trucking*, is whether the regulations "hav[e] the force and effect of law." 133 S. Ct. 2102.

In answering that question, the Supreme Court noted that the FAAAA preemption provision "draws a rough line between a government's exercise of regulatory authority and its own contract-based participation in a market." *Id.*  Stated differently, the "force and effect of law" provision excludes from the statute's preemptive scope contractual arrangements made by a State when it acts as a market participant rather than a market regulator.  *Id.*  The existence of a contractual relationship between the Port and trucking companies was not conclusive in determining whether the Port acted in a regulatory as opposed to a proprietary role.  *Id.* at 2102– 03.  The Port "exercised classic regulatory authority" by first, requiring trucking companies to enter into the contracts in order to provide drayage services, and second, imposing criminal penalties on terminal operators for granting port access to any unregistered truck.  *Id.* at 2103. "So the contract here functions," the Court reasoned, "as part and parcel of a governmental program wielding coercive power over private parties, backed by the threat of criminal punishment."  *Id.* at 2103.  The Court continued:

> The Port here has not acted as a private party, contracting in a way that the owner of an ordinary commercial enterprise could mimic. Rather, it has forced terminal operators—and through them, trucking companies—to alter their conduct by implementing a criminal prohibition punishable by time in prison. In some cases, the question whether governmental action has the force of law may pose

difficulties; the line between regulatory and proprietary conduct has soft edges. But this case takes us nowhere near those uncertain boundaries.

*Id.*

Defendants try their best to distinguish *American Trucking* on the basis that the laws at issue here—the statutory caps and fee schedules limiting Air Evac's reimbursement, the balance-billing prohibitions, and the alteration of the membership contracts—are not enforced through the State's classic regulatory authority. Unlike the Port Authority in *American Trucking*, which coerced contractual concessions through threat of criminal sanctions, Defendants contend that "the amount PEIA and the OIC have agreed to reimburse Air Evac for emergency air-evacuation services is not enforced by the coercive mechanisms of the government." (Defs.' Mem. at 17.) This is a dubious argument for several reasons, the most obvious of which is the fact that Air Evac has no contract with PEIA or the workers' compensation insurance program. Air Evac has not agreed to be bound by the State's regulations, nor can Air Evac opt out of the fee restrictions by declining to transport patients insured by PEIA and workers' compensation, and Air Evac alleges that it must provide services to all patients in need of emergency air ambulance services, regardless of ability to pay. In other words, even if Air Evac had means to discover a patient's insured status prior to rendering service, state regulations prohibit it from refusing service on that basis. Because the State cannot manipulate Air Evac's fees by contract, it appears to have resorted to the regulatory process as a means to do so.

Further, as Air Evac points out, states do not typically enact laws without securing compliance through exercise of their coercive power. The laws at issue are replete with civil and criminal penalties.[3] West Virginia Code § 16-29D-4(a) is just one example. Section 16-29D-4(a)

---

[3] *See* W. Va. Code § 5-16-12(a), (c), (d) (imposing civil and criminal liability for knowingly securing or

23

forbids health care providers like Air Evac to "balance bill" a patient covered by PEIA or Workers' Compensation. The statute creates an exception for "the delivery of health care services" in an "imminent life-threatening medical or surgical emergency." *Id.* A health care entity violating the balancing billing provision is subject to civil penalties of up to $25,000. W. Va. Code § 16-29D-8. Defendants argue these penalties do not apply to Air Evac because provides services almost exclusively in emergency situations. Air Evac alleges that West Virginia has previously taken the position that the balancing billing exclusion applies to all of its air ambulance services. (Am. Compl. ¶ 47.) The Court must accept this allegation as true. *Ashcroft*, 556 U.S. at 678.

Accordingly, the Court finds that Air Evac plausibly alleges facts sufficient to support its preemption claims. The Court affirms the ADA's application to the various laws and regulations identified in the Amended Complaint and finds that Air Evac plausibly alleges a scenario where the State is acting as a market regulator, not a market participant. It could be that over the course of discovery, Defendants produce evidence that an air ambulance would not be held civilly or criminally liable for violations of these laws under any scenario. Clearly, the "market participant" question will benefit from factual development that is not presently available to the Court. This matter is better reserved for summary judgment. For present purposes, the Court **FINDS** that Air Evac plausibly alleges grounds giving rise to preemption under the ADA.

    *iii.    Tenth Amendment*

---

attempting to secure benefits above the statutory cap, willfully overcharging for services, causing a loss to or overpayment from PEIA, or knowingly attempting to secure greater benefits through willful misrepresentation of any material fact); § 16-29D-8 (payment of fines for balance-billing); § 23-1-19(a) (providing for the imposition of fines against any person who willfully obtains or attempts to obtain greater benefits than those provided under the workers' compensation laws and regulations); § 61-3-24g(1) (punishing as a felony the knowing and willful charging of amounts above the maximum amounts set forth by the OIC fee schedule).

Next, Defendants move to dismiss on Tenth Amendment grounds. "Assuming this Court finds that West Virginia's actions are preempted under the ADA," they write, "this Court should find that Congress exceeded its authority because such preemption is contrary to the powers reserved to the State by the Tenth Amendment of the United States Constitution." (Defs.' Mem. in Support Mot. to Dismiss 21.) Defendants have moved to dismiss for failure to state a claim, not for summary judgment. The question of whether the ADA preempts West Virginia law is the ultimate question at issue in the Amended Complaint, and not appropriate for resolution on a motion to dismiss. The Court has not resolved that question in this Memorandum Opinion. This argument is not directed to any deficiency in Air Evac's pleading and the Court **DENIES** the Amended Motion to Dismiss to the extent premised on the Tenth Amendment. If Defendants wish to lodge a Tenth Amendment challenge to the ADA, they are at liberty to do so by summary judgment motion.

### D. Contracts Clause

Finally, Defendants argue that Count Three fails to state a claim because § 5-16-8a(b) does not violate the Contracts Clause.

The Contracts Clause dictates, "No State shall . . . pass any . . . Law impairing the Obligation of Contracts." U.S. Const. art. 1, §10, cl. 1. The Clause "is not interpreted 'absolutely to prohibit the impairment of . . . government contracts.'" *Catawba Indian Tribe v. City of Rock Hill*, 501 F.3d 368, 371 (4th Cir. 2007) (quoting *Balt. Teachers Union v. Mayor and City Council of Balt.*, 6 F.3d 1012, 1014 (4th Cir. 1993)). Rather, the "claimant must show (1) contractual impairment, (2) that is substantial, and (3) not a legitimate exercise of state power." *Id.* (citing *City of Charleston v. Pub. Serv. Comm'n*, 57 F.3d 385, 391 (4th Cir. 1995)).

This three-party inquiry is necessarily fact-intensive and does not lend itself well to resolution on a motion to dismiss. On the third prong of the test, for example, Defendants contend that the enactment of HB 4315 was reasonable in relation to an important public purpose. The Court has no evidence by which to assess the merits of this bald assertion. Even if Defendants had provided evidentiary support for their arguments, the Court could not consider it without converting the motion to dismiss into a motion for summary judgment. The Court declines Defendants' invitation to adjudicate Air Evac's Contracts Clause claim at the motion to dismiss stage of the proceedings. The motion to dismiss the Contracts Clause claim is **DENIED**.

*IV.    CONCLUSION*

For the foregoing reasons, the Court **DENIES** Defendants' Amended Motion to Dismiss. (ECF No. 37.)

**IT IS SO ORDERED**.

The Court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented party.

ENTER:        May 15, 2017

THOMAS E. JOHNSTON
UNITED STATES DISTRICT JUDGE